WAWD # MJ20-5220

I hereby attest and certify on Jan 08, 2020 that the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody.

Clerk, U.S. District Court
Southern District of California

By: s/ S. Andersen
Deputy

FILED

2020 JAN -8 P 4: 02

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ONGKARUCK SRIPETCH (1),<br>　aka King Richards,<br>　aka Shelby Saint-Claire,<br>MICHAEL WEXLER (2),<br>ASHMIT PATEL (3),<br>ANDREW MCALPINE (4),<br><br>　　　　Defendants. | Case No. 20 CR0160 H<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 371 – Conspiracy to Commit Securities Fraud, Manipulative Trading; Title 15, U.S.C., Secs. 78j(b), 78ff, and Title 17, C.F.R., Sec. 240.10b-5 – Securities Fraud; Title 15, U.S.C., Secs. 78i(a)(1), 78ff – Manipulative Securities Trading; Title 18, U.S.C., Sec. 2 – Aiding and Abetting; Title 18, U.S.C., Sec. 981(a)(1)(C) and Title 28, U.S.C., Sec. 2461(c) – Criminal Forfeiture |

The grand jury charges at all times relevant herein:

**INTRODUCTORY ALLEGATIONS**

Relevant Individuals and Entities

1.  Defendant ONGKARUCK SRIPETCH, aka King Richards, aka Shelby Saint-Claire, a resident of Las Vegas, Nevada, ran a stock promotion website called Stockpalooza, and controlled several entities, including King Mutual Solutions, Inc., Optimus Prime Financial, Inc. ("Optimus Prime"), and Adtron, Inc. ("Adtron").

2.  Defendant MICHAEL WEXLER, a resident of Ottawa, Ontario, Canada, was the chief executive officer of VMS Rehab Systems, Inc. ("VMS Rehab Systems"), and Argus Worldwide Corp. ("Argus Worldwide"), and

AJGA:nlv(1):San Diego:1/8/20

controlled the entities Derving Enterprises Ltd. ("Derving Enterprises") and Spectrum Global Diversified Corp. ("Spectrum Global").

3. Defendant ASHMIT PATEL, a resident of Oakville, Ontario, Canada, was a lawyer and was admitted to the Illinois State Bar Association in November 2012. PATEL maintained a domestic brokerage account with GP Nurmenkari, Inc.

4. Defendant ANDREW MCALPINE, a resident of Grand Cayman, Cayman Islands, maintained an offshore brokerage account in the name of Dunstaffnage Corporation with Seven Mile Securities in the Cayman Islands ("Offshore Brokerage Account").

5. VMS Rehab Systems was headquartered in Ottawa, Ontario, Canada. VMS Rehab Systems traded on the OTC Markets — a financial market that provides information for over-the-counter securities — under the ticker symbol "VRSYF." VMS Rehab Systems stock was thinly traded and the market for its stock was illiquid. According to its website, VMS Rehab was in the business of selling "quality of life orthopedic seat cushions for the home healthcare sector."

6. Argus Worldwide was headquartered in Cheyenne, Wyoming with affiliate offices in Poland, Canada, and the Netherlands. Argus Worldwide traded on the OTC Markets under the ticker symbol "ARGW." Argus Worldwide stock was thinly traded and the market for its stock was illiquid. According to a press release, ARGW was engaged in various "business segments including . . . digital/internet products and services, smart consumer electronic products and health industries such as generic pharmaceuticals."

7. Confidential Witness 1 ("CW-1"), was a resident of California, and maintained several domestic brokerage accounts in CW-1's name. CW-1

1 was the president of Company 1 and maintained multiple bank accounts and brokerage accounts in Company 1's name.

8. Company 2 was an entity that served as an intermediary between stock promoters and stock promotion publications.

9. A pump-and-dump scheme was a fraudulent scheme that typically involved the artificial inflation of the stock price of a publicly-traded company (the "pump") so that individuals who control a substantial portion of the company's stock can sell shares of that stock at artificially high prices to other investors (the "dump"). Generally, such schemes effected the artificial inflation in share price by, among other things, issuing news releases and promotional materials regarding the company and its stock - often containing false, misleading, or exaggerated information - and by engaging in manipulative trading of the stock to affect its price and generate the appearance of demand for the shares.

10. A manipulative trading scheme was a fraudulent scheme that involved practices, including matched trades - *i.e.,* selling (or buying) stock at pre-arranged prices and volumes - carried out for the purpose of creating the false and misleading appearance of (a) trading activity for such stock, and (b) the market for such stock.

Count 1 - Conspiracy

(18 U.S.C. § 371)

11. Paragraphs 1 through 10 of the Introductory Allegations above are re-alleged as if fully set forth herein.

12. Beginning on a date unknown to the Grand Jury but no later than September 2014, and continuing until in or around January 2017, within the Southern District of California and elsewhere, defendants ONGKARUCK SRIPETCH, aka King Richards, aka Shelby Saint-Claire, MICHAEL

WEXLER, and ASHMIT PATEL, and other individuals and entities known and unknown to the Grand Jury, did knowingly and intentionally conspire to commit offenses against the United States, that is,

    a. securities fraud, namely, to knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by (a) employing devices, schemes and artifices to defraud, (b) making and causing to be made untrue statements of material fact, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of the securities of VMS Rehab Systems in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and

    b. manipulative securities trading, namely, to knowingly and willfully, directly and indirectly, by the use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange, for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for any such security, (a) entering an order and orders for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been and will be entered by and for the same and different parties,

and (b) entering any order and orders for the sale of any such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been and will be entered by and for the same and different parties, in violation of Title 15, United States Code, Sections 78i(a)(1) and 78ff.

## MANNER AND MEANS OF THE CONSPIRACY

13. In furtherance of their conspiracy, and to effect its objects, SRIPETCH, WEXLER, and PATEL used the following manner and means, among others:

   a. PATEL acquired 12 million shares of VMS Rehab Systems stock, purportedly in exchange for providing legal services.

   b. PATEL made misrepresentations to his brokerage firm in order to deposit and trade the shares of VMS Rehab Systems stock through his brokerage account.

   c. SRIPETCH and CW-1 engaged in manipulative trading in the stock of VMS Rehab Systems for the purpose of creating a false or misleading appearance of active trading in VMS Rehab Systems stock, and a false or misleading appearance with respect to the market for VMS Rehab Systems stock.

   d. WEXLER issued press releases about VMS Rehab Systems in order to generate interest in the company and its stock, and to provide material to be used in third-party promotions of VMS Rehab Systems stock.

   e. SRIPTECH promoted, and caused the promotion of, VMS Rehab Systems and its stock in order to artificially avoid the deflation of, maintain, and inflate the share price of VMS Rehab Systems stock.

   f. PATEL sold VMS Rehab Systems stock from his brokerage account into the open market at inflated prices, which the defendants

manipulated by promoting VMS Rehab Systems and its stock without disclosing their plan to sell such stock during the promotions and after a period of manipulative trading.

  g. After selling VMS Rehab Systems stock, PATEL transferred a portion of the proceeds to a Company 1 bank account controlled by CW-1. CW-1, in turn, transferred a portion of the proceeds to CW-1's personal bank account and another portion of the proceeds to an Optimus Prime bank account controlled by SRIPETCH.

  h. During the time period when PATEL sold VMS Rehab Systems stock, PATEL transferred money from an interest only lawyer trust account ("IOLTA") he controlled to a Spectrum Global bank account controlled by WEXLER as payment for WEXLER's participation in the conspiracy.

## OVERT ACTS

14. In furtherance of the conspiracy and to effect and accomplish the objects thereof, the following overt acts, among others, were committed within the Southern District of California and elsewhere:

  a. On or about September 2, 2015, PATEL and WEXLER entered into an attorney fee agreement whereby PATEL agreed to act as VMS Rehab Systems' corporate counsel for 45 days in exchange for 10 million shares of VMS Rehab Systems stock.

  b. On or about April 29, 2016, around 12:58 p.m., CW-1 entered an order to sell VMS Rehab Systems stock from a brokerage account held in CW-1's name for $1.78 per share. Around 1:25 p.m., SRIPETCH entered an order to purchase VMS Rehab Systems stock from an account held in SRIPETCH's name for $1.78 per share. A corresponding trade for 200 shares at $1.78 per share was executed in the market.

  c. On or about May 18, 2016, around 2:48 p.m., SRIPETCH entered an order to sell VMS Rehab Systems stock from a brokerage account

held in CW-1's name for $1.88 per share. Around 2:49 p.m., CW-1 entered an order to purchase VMS Rehab Systems stock from another brokerage account held in CW-1's name for $1.88 per share. A corresponding trade for 500 shares at $1.88 per share was executed in the market.

   d. On or about May 23, 2016, around 3:14 p.m., CW-1 entered an order to purchase VMS Rehab Systems stock from a brokerage account held in CW-1's name for $2.05 per share. Around 3:33 p.m., SRIPETCH entered an order to sell VMS Rehab Systems stock from a brokerage account held in SRIPETCH's name for $2.05 per share. A corresponding trade for 500 shares at $2.05 per share was executed in the market.

   e. On or about May 24, 2016, SRIPETCH wired, or caused to be wired, $26,000 from an Optimus Prime bank account to Company 2 to facilitate a promotion of VMS Rehab Systems and its stock.

   f. On or about July 6, 2016, WEXLER issued, or caused to be issued, a press release from VMS Rehab Systems announcing a preliminary sales forecast of $38 million through 2022 for a generic drug that VMS Rehab Systems purportedly was developing and testing.

   g. On or about October 27, 2016, WEXLER signed a written resolution of the VMS Rehab Systems Board of Directors authorizing Island Stock Transfer to issue 10 million shares of VMS Rehab Systems stock to PATEL via a physical share certificate.

   h. On or about November 22, 2016, WEXLER issued, or caused to be issued, a press release from VMS Rehab Systems announcing a planned acquisition of an electronic health company.

   i. On or about December 21, 2016, PATEL sold, or caused to be sold, 5,321,434 shares of VMS Rehab Systems through his brokerage account for proceeds of $183,057.33.

  j. On or about December 23, 2016, PATEL transferred $56,500 from his bank account to a Company 1 bank account controlled by CW-1.

  k. On or about December 23, 2016, CW-1 transferred $29,700 from a Company 1 bank account to an Optimus Prime bank account controlled by SRIPETCH.

  l. On or about December 23, 2016, PATEL wired, or caused to be wired, $9,000 from an IOLTA he controlled to a Spectrum Global bank account controlled by WEXLER.

All in violation of Title 18, United States Code, Section 371.

Count 2 - Securities Fraud

(Title 15, U.S.C., Secs. 78j(b), 78ff, and

Title 17, C.F.R., Sec. 240.10b-5)

  15. The allegations set forth in paragraphs 1 through 10 are re-alleged as if fully set forth herein.

  16. Beginning on a date unknown to the Grand Jury but no later than September 2014, and continuing until on or about January 2017, within the Southern District of California and elsewhere, defendants ONGKARUCK SRIPETCH, aka King Richards, aka Shelby Saint Claire, MICHAEL WEXLER, and ASHMIT PATEL did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by VMS Rehab Systems, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud, (b) making and causing to be made untrue statements of material fact, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c)

8

engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of VMS Rehab Systems' securities.

17. Paragraph 11 through 13, and all subparagraphs, of Count 1 are realleged and incorporated by reference as more fully describing the manipulative and deceptive devices and contrivances used in connection with the purchase and sale of securities.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

Counts 3-5 - Manipulative Securities Trading, Aiding & Abetting
(Title 15, U.S.C., Secs. 78i(a)(1), and 78ff;
Title 18, U.S.C., Sec. 2)

18. The allegations set forth in paragraphs 1 through 14 are realleged as if fully set forth herein.

19. On or about the dates listed below, in connection with the securities transactions described below, within the Southern District of California and elsewhere, defendant ONGKARUCK SRIPETCH, aka King Richards, aka Shelby Saint-Claire, aided and abetted manipulative securities trading by CW-1, who did knowingly and willfully, directly and indirectly, by the use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange, for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for any such security, (a) entered an order and orders as set forth below for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at

9

substantially the same price, for the sale of any such security, had been and would be entered by and for the same and different parties, and (b) entered an order and orders as set forth below for the sale of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, had been and would be entered by and for the same and different parties:

| Count | Date | Trade Order and Time (Eastern) |
|---|---|---|
| 3 | April 29, 2016 | At or around 12:58 p.m., CW-1 entered an order to sell VMS Rehab Systems stock from a brokerage account held in CW-1's name. |
| 4 | May 18, 2016 | At or around 2:48 p.m., SRIPETCH entered an order to sell VMS Rehab Systems stock from a brokerage account held in CW-1's name. |
| 5 | May 23, 2016 | At or around 3:14 p.m., CW-1 entered an order to purchase VMS Rehab Systems stock from a brokerage account held in CW-1's name. |

All in violation of Title 15, United States Code, Sections 78i(a)(1), and 78ff, and Title 18, United States Code, Section 2.

Count 6 - Conspiracy

(18 U.S.C. § 371)

20. Paragraphs 1 through 10 of the Introductory Allegations above are realleged as if fully set forth herein.

10

21. Beginning on a date unknown to the Grand Jury but no later than March 2018, and continuing until in or around March 2019, within the Southern District of California and elsewhere, defendants ONGKARUCK SRIPETCH, aka King Richards, aka Shelby Saint-Claire, MICHAEL WEXLER, and ANDREW MCALPINE, and other individuals and entities known and unknown to the Grand Jury, did knowingly and intentionally conspire to commit offenses against the United States, that is,

    a. securities fraud, namely, to knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by (a) employing devices, schemes and artifices to defraud, (b) making and causing to be made untrue statements of material fact, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of the securities of Argus Worldwide in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and

    b. manipulative securities trading, namely, to knowingly and willfully, directly and indirectly, by the use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange, (1) for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for any such security, (a) entering an order and

orders for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been and will be entered by and for the same and different parties, and (b) entering any order and orders for the sale of any such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been and will be entered by and for the same and different parties, in violation of Title 15, United States Code, Sections 78i(a)(1) and 78ff.

## MANNER AND MEANS OF THE CONSPIRACY

22. In furtherance of their conspiracy, and to effect its objects, SRIPETCH, WEXLER, and MCALPINE used the following manner and means, among others:

    a. WEXLER gave 1.5 million shares of Argus Worldwide stock to CW-1, and falsely represented in a letter relied on by a brokerage firm that "no repayment is expected or implied in this gift."

    b. CW-1 deposited 800,000 of the 1.5 million shares into one of his personal brokerage accounts. CW-1 transferred 700,000 of the 1.5 million shares to MCALPINE, who deposited the shares into his Offshore Brokerage Account.

    c. SRIPETCH and MCALPINE engaged in manipulative trading in the stock of Argus Worldwide for the purpose of creating a false or misleading appearance of active trading in Argus Worldwide stock, and a false or misleading appearance with respect to the market for Argus Worldwide stock.

    d. WEXLER, in coordination with SRIPETCH and CW-1, issued press releases about Argus Worldwide in order to generate interest in

the company and its stock, and to provide material to be used in third-party promotions of Argus Worldwide stock.

  e. SRIPTECH promoted, and caused the promotion of, Argus Worldwide and its stock in order to artificially avoid the deflation of, maintain, and inflate the share price of Argus Worldwide stock.

  f. CW-1, MCALPINE, and SRIPETCH sold Argus Worldwide stock from their respective brokerage accounts into the open market at inflated prices, which the defendants manipulated by promoting Argus Worldwide and its stock without disclosing their plan to sell such stock during the promotions and after a period of manipulative trading.

  g. After selling Argus Worldwide stock, CW-1 transferred the proceeds from his personal brokerage account to a Company 1 bank account controlled by CW-1. CW-1 then transferred a portion of the proceeds to accounts controlled by SRIPETCH and WEXLER, including through intermediaries.

  h. WEXLER and CW-1 created fake loan agreements designed to disguise the true source of a portion of the stock proceeds transferred to accounts controlled by WEXLER.

## OVERT ACTS

23. In furtherance of the conspiracy and to effect and accomplish the objects thereof, the following overt acts, among others, were committed within the Southern District of California and elsewhere:

  a. On or about March 1, 2018, WEXLER signed a letter to CW-1 stating that he was giving 1.5 million shares of Argus Worldwide to CW-1.

  b. On or about April 3, 2018, CW-1 deposited 800,000 of the 1.5 million shares of Argus Worldwide into his personal brokerage account.

13

      c.    On or about April 10, 2018, around 12:33 p.m., SRIPETCH entered an order to sell Argus Worldwide stock from a brokerage account held in the name of another individual for $3.45 per share. Around 12:33 p.m., SRIPETCH entered an order to buy Argus Worldwide stock from a brokerage account held in SRIPETCH's name for $3.45 per share. A corresponding trade for 400 shares at $3.45 per share was executed in the market.

      d.    On or about April 20, 2018, around 2:28 p.m., SRIPETCH entered an order to sell Argus Worldwide stock from a brokerage account held in SRIPETCH's name for $3.68 per share. Around 2:28 p.m., SRIPETCH entered an order to buy Argus Worldwide stock from a different brokerage account held in SRIPETCH's name for $3.68 per share. A corresponding trade for 250 shares at $3.68 per share was executed in the market.

      e.    On or about May 3, 2018, SRIPETCH wired, or caused to be wired, $23,000 from an Adtron bank account to Company 2 to facilitate a promotion of Argus Worldwide and its stock.

      f.    On or about May 14, 2018, WEXLER sent CW-1 an encrypted message stating: "Any thoughts on our market? I am gearing for another release or two before month end." CW-1 replied: "Yes, please release. We should get one more push in before end of month, having PR before that event will help demonstrably."

      g.    On or about May 22, 2018, WEXLER issued, or caused to be issued, a press release discussing its "global aggregator," which purportedly would "make available to the user a host of new and widely used Internet based applications on a single . . . platform shaping the company's reputation for enhancing the digital experience on line."

h. On or about June 7, 2018, CW-1 sent an encrypted message to WEXLER stating: "Not a big push today, just spending money to boost the stock price and create higher average volumes."

i. On or about June 16, 2018, WEXLER sent an encrypted message to CW-1 stating: "do I understand you correctly that the plan now is to run another promo in a couple of weeks?"

j. On or about July 9, 2018, CW-1 sent a spreadsheet to WEXLER through an encrypted communication that listed all of CW-1's sales of Argus Worldwide stock on July 5 and 6, 2018, and the three-way split of the profits between SRIPETCH, WEXLER, and CW-1.

k. On or about October 25, 2018, MCALPINE deposited 700,000 shares of Argus Worldwide stock that he received from CW-1 into his offshore brokerage account.

l. On or about November 1, 2018, WEXLER sent an encrypted communication to CW-1 stating that he was working on what "would under normal circumstances be a genuine market moving story" that would give "powerful ammo for [SRIPETCH] to move the stock much higher when the story breaks."

m. On or about November 5, 2018, MCALPINE sold, or caused to be sold, 12,500 shares of Argus Worldwide stock through his Offshore Brokerage Account for proceeds of $9,065.80.

n. On or about January 14, 2019, SRIPETCH sent an encrypted communication to MCALPINE and CW-1 instructing MCALPINE to place an order to sell 5,000 shares of Argus Worldwide stock at $0.35 per share.

o. On or about January 14, 2019, SRIPETCH entered an order to buy Argus Worldwide stock from a brokerage account held in SRIPETCH's name for $0.35 per share. A corresponding trade for 5,000 shares at $0.35 per share was executed in the market.

p. On or about January 17, 2019, CW-1 sent an encrypted communication to SRIPETCH and MCALPINE containing a screenshot of a previous communication between CW-1 and WEXLER about the timing of an upcoming Argus Worldwide press release.

q. On or about January 17, 2019, SRIPETCH wired, or caused to be wired, $45,000 from an Adtron bank account to Company 2, $22,500 of which was to facilitate a promotion of Argus Worldwide and its stock.

r. On or about February 4, 2019, MCALPINE sold, or caused to be sold, 155,000 shares of Argus Worldwide stock through his Offshore Brokerage Account for proceeds of $94,618.26.

s. On or about February 4, 2019, SRIPETCH sold, or caused to be sold, 193,950 shares of Argus Worldwide stock through his brokerage account for proceeds of $119,625.96.

t. On or about March 20, 2019, SRIPETCH wired, or caused to be wired, $33,392.25 from an Adtron bank account to a Spectrum Global bank account controlled by WEXLER.

All in violation of Title 18, United States Code, Section 371.

### Count 7 - Securities Fraud
(Title 15, U.S.C., Secs. 78j(b), 78ff, and
Title 17, C.F.R., Sec. 240.10b-5)

24. The allegations set forth in paragraphs 1 through 10 are re-alleged as if fully set forth herein.

25. Beginning on a date unknown to the Grand Jury but no later than March 2018, and continuing until in or about March 2019, within the Southern District of California and elsewhere, defendants ONGKARUCK SRIPETCH, aka King Richards, aka Shelby Saint Claire, MICHAEL WEXLER, and ANDREW MCALPINE did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate

commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities issued by Argus Worldwide, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud, (b) making and causing to be made untrue statements of material fact, and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of Argus Worldwide's securities.

26. Paragraphs 20 through 22, and all subparagraphs, of Count 6 are realleged and incorporated by reference as more fully describing the manipulative and deceptive devices and contrivances used in connection with the purchase and sale of securities.

All in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## FORFEITURE ALLEGATIONS

27. The allegations contained in paragraphs 1 through 10 and Counts 1 through 7 of this Indictment are realleged and incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

28. Upon conviction of one or more of the offenses set forth in Counts 1 through 7, defendants ONGKARUCK SRIPETCH, aka King Richards, aka Shelby Saint-Claire, MICHAEL WEXLER, ASHMIT PATEL, and ANDREW MCALPINE shall forfeit to the United States any property, real and

personal, which constitutes or is derived from proceeds traceable to the violations.

29. Pursuant to Title 28, United States Code, Section 2461(c) which incorporates the provisions of Title 21, United States Code, Section 853(p), the defendants shall forfeit substitute property, up to the value of the amounts described above, if, as a result of any act or omission of the defendants, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of this court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

DATED: January 8, 2020.

A TRUE BILL:

██████████████
Foreperson

ROBERT S. BREWER, JR.
United States Attorney

By: *(signature)*
ANDREW J. GALVIN
AARON P. ARNZEN
Assistant U.S. Attorneys